**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MINNESOTA LAWYERS MUTUAL INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> JERRY A. SCHULMAN, individually and d/b/a the Law Offices of Jerry A. Schulman, DARLENE M. KOPTA, DARSTAR ENTERPRISES, INC., an Illinois Corporation, AMERICAN SURGICAL INSTRUMENTS CORPORATION, d/b/a ASICO, and ASICO, LLC, <br><br> Defendants. | )<br>)<br>)<br>)<br>)   No. 14-cv-50142<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, United States District Judge:

Before the Court is Plaintiff Minnesota Lawyers Mutual Insurance Company ("MLM")'s motion for summary judgment on Counts I, III, and V of the Second Amended Complaint. (R.176). In particular, MLM seeks an order: (i) rescinding the professional liability policies that MLM issued to Defendant Jerry A. Schulman ("Schulman"), effective on or after January 1, 2012 (Count I); (ii) declaring that the claims-made provision of MLM's policies do not provide coverage for identified claims, suits, and disciplinary actions, and declaring that MLM owes no defense or indemnity obligation to Schulman arising from said matters (Count III); and (iii) declaring that Schulman breached the notice provision of MLM's policies with respect to said matters, barring any associated defense or indemnity obligation (Count V). (R.124, Second Am.

Compl. for Declaratory Judgment). Defendant Schulman has opposed this motion.[1] For the following reasons, the Court grants MLM's motion for summary judgment as to Count I. The Court denies as moot its motion as to Counts III and V.

**BACKGROUND**[2]

## I.     The Parties

Plaintiff MLM is a Minnesota insurance corporation with its principal place of business in Minneapolis, Minnesota. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 1). Defendant Schulman is a patent and trademark attorney and a citizen of Illinois. (*Id.* ¶¶ 2, 16, 79). Defendant Darlene Kopta is a citizen of Illinois, and Defendant Darstar Enterprises, Inc. is an Illinois corporation with its principal place of business in Illinois. (*Id.* ¶ 3). Former named defendant American Surgical Instruments Corporation is a Delaware corporation with its principal place of business in Illinois, while ASICO, LLC is an Illinois liability corporation whose members—Ravi Nallakrishnan, Sagar Ghotavadekar, and Abishishek Gundugurti—are citizens of Illinois. (*Id.* ¶ 4).[3] Jurisdiction and venue are proper in this Court. (*Id.* ¶ 5). Kopta and ASICO were clients of Schulman.

---

[1] Defendants Darlene M. Kopta and Darstar Enterprises, Inc. (collectively, "Kopta") have not opposed this motion. The Court previously dismissed the claims against Defendants American Surgical Instruments Corporation and ASICO, LLC (collectively, "ASICO") pursuant to a stipulation of dismissal. (R.167, R.169).

[2] Although the parties filed numerous documents under seal, the Seventh Circuit has held that "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *see also United States v. Foster*, 564 F.3d 852, 853 (7th Cir. 2009) (Easterbrook, C.J.) (sealed documents "that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.")

[3] Schulman denies MLM's jurisdictional statement relating to ASICO on the basis of a lack of knowledge. (R.210, Rule 56.1(b)(3)(B) Stmt. Facts ¶ 4). This response is improper, and the Court deems the Rule 56.1(a)(3)statement admitted. *See Buttron v. Sheehan*, No. 00 C 4451, 2003 WL 21801222, at *6 (N.D. Ill. Aug. 4, 2003).

## II.    Northern District of Illinois Local Rule 56.1

Because Schulman is proceeding pro se,[4] MLM served him with a "Notice to Pro Se

Litigant Opposing Motion for Summary Judgment" as required by Northern District of Illinois

Local Rule 56.2. (R.192). The notice explains the consequences of failing to properly respond

to a motion for summary judgment and statement of material facts under Federal Rule of Civil

Procedure 56 and Local Rule 56.1.

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the

advantage of the parties' familiarity with the record and often cannot afford to spend the time

combing the record to locate the relevant information,' in determining whether a trial is

necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local

Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which

the moving party contends there is no genuine issue and that entitle the moving party to a

judgment as a matter of law." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). "The

non-moving party must file a response to the moving party's statement, and, in the case of any

disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting

materials relied upon.'" *Id.* (citation omitted); *see also* L.R. 56.1(b)(3)(B). Local Rule

56.1(b)(3)(C) "requires specifically that a litigant seeking to oppose a motion for summary

judgment file a response that contains a separate 'statement . . . of any additional facts that

require the denial of summary judgment.'" *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398

(7th Cir. 2012) (citation omitted). "The obligations set forth by a court's local rules are not mere

formalities." *Zuppardi v. Wal–Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014). District

courts have discretion, therefore, "to strictly enforce local rules regarding summary judgment by

---

[4] Schulman was initially represented by counsel, but the Court granted counsel's request to withdraw without objection. (R.166).

accepting the movant's version of facts as undisputed if the non-movant has failed to respond in the form required." *Id.*; *see also Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) ("This Court has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1").

Although courts construe pro se pleadings liberally, *see Ambrose v. Roeckeman*, 749 F.3d 615, 618 (7th Cir. 2014), a litigant's pro se status does not excuse him from complying with the federal and local procedural rules. *See Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("even pro se litigants must follow procedural rules"); *McNeil v. United States*, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel"). In addition, because Schulman is a licensed attorney proceeding pro se, the Court does not grant him "the flexible treatment granted other pro se litigants." *Cole v. C.I.R.*, 637 F.3d 767, 773 (7th Cir. 2011); *see also Hill v. Capital One Bank (USA), N.A.*, No. 14-CV-6236, 2015 WL 468878, at *4 (N.D. Ill. Feb. 3, 2015) (same).

Here, Schulman's summary judgment submission consists of a Local Rule 56.1(b)(3)(B) response, along with a response brief. Schulman did not supplement the record with additional evidence or affidavits, or submit a separate statement of additional facts under Local Rule 56.1(b)(3)(C). His Local Rule 56.1(b)(3)(B) response expressly admits ¶¶ 1, 2, 3, 5, 6, 7, 9, 16, 22, 23, 28, 31, 34, 37, 49, 50, 52, 54, 55, 61, 69, 70, 74, 75, 77, 78, and 79 of MLM's Local Rule 56.1(a)(3) statement. (R.210). The response denies, in full or in part, the remaining paragraphs of the Local Rule 56.1(a)(3) statement. (*Id.*). Most of these denials, however, do not comply with Local Rule 56.1. In particular, Schulman's responses to ¶¶ 8, 10, 11-15, 17-20, 24, 27, 30, 33, 36, 38, 39-40, 41, 44, 56-59, 63-65, 67, 68, and 72-73 fail to include record citations

demonstrating a factual dispute. *See Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000) (Local Rule 56.1(b) "is not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted. It is also not satisfied by citations to the record that support legal argument rather than controvert material facts"); *see also Buttron v. Sheehan*, No. 00 C 4451, 2003 WL 21801222, at *4 (N.D. Ill. Aug. 4, 2003) (striking response "for failure to provide a citation to facts that evidence a dispute"). To the extent Schulman includes record citations, he cites to deposition testimony bearing on his general "understanding" of the policy terms and the policy application process, and the general reasoning behind (i) his docketing and filing practices for ASICO, and (ii) his petition to revive Kopta's patent application. Given that MLM's asserted facts concern specific matters handled by Schulman, this response does not satisfy Local Rule 56.1(b)(3)(B)'s requirement to include "specific references" to the record "in the case of any disagreement," and/or Local Rule 56.1(b)(3)(C)'s requirement to set forth a *separate* statement "of any additional facts that require the denial of summary judgment," with supporting evidence. *See* L.R. 56.1(b); *see also Buttron*, 2003 WL 21801222 at *3 (non-movant must offer specific facts creating a genuine issue for trial and may not rely on general, conclusory statements); *Bolden v. Dart*, No. 11 C 8661, 2013 WL 3819638, at *2-4 (N.D. Ill. July 23, 2013). As the Court has previously recognized, "the purpose of Local Rule 56.1 statements and responses is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments." *Kelley v. Hardy*, No. 14 C 1936, 2016 WL 3752970, at *1 (N.D. Ill. July 14, 2016) (citing *Zimmerman v. Doran*, 807 F.3d 178, 180 (7th Cir. 2015)). In responding to MLM's Local Rule 56.1(a)(3) statement ¶¶ 8, 10, 11-15, 17-20, 24, 27, 30, 33, 36, 38, 39-40, 41, 44, 56-59, 63-65, 67, 68, and 72-73, Schulman has failed to meet this standard. Accordingly, the Court deems the underlying statements of fact uncontested.[5]

---

[5] The Court agrees with Schulman, however, that MLM's Rule 56.1(a)(3) ¶¶ 25-26, 43, 45-48, 60, and 66—each

The relevant facts, stated as favorably to Schulman as the record and Local Rule 56.1 permit, are as follows.

**III.    The Policies At Issue**

Beginning in January 2003, MLM issued to Schulman a series of claims-made Lawyers Professional Liability Policies, which were in effect for consecutive policy periods until January 1, 2015.  (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 6).  This case concerns three of those policies:  (1) Policy No. 7557 10, effective January 1, 2012 to January 1, 2013 (the "2012 Policy"); (2) Policy No. 7557 11, effective January 1, 2013 to January 1, 2014 (the "2013 Policy"); and (3) Policy No. 7557 12, effective January 1, 2014 to January 1, 2015 (the "2014 Policy") (collectively, the "MLM Policies").  (*Id.*).

**A.    The MLM Policies**

The MLM Policies all bore the following caption:

**LAWYERS PROFESSIONAL LIABILITY POLICY**
**(THIS IS A CLAIMS-MADE POLICY – READ CAREFULLY)**

(*Id.* at ¶ 7; *see also* R.1-2, 2012 Policy; R.124-3, 2013 Policy; R.124-4, 2014 Policy).

The MLM Policies all contained the following "Coverage" provision:

WE will pay, subject to OUR limit of liability, all DAMAGES the INSURED may be legally obligated to pay and CLAIM EXPENSE(S), due to any CLAIM, provided that:

(1) the CLAIM arises out of any act, error or omission of the INSURED or a person for whose acts the INSURED is legally responsible;
(2) the act, error, or omission occurred on or after the PRIOR ACTS RETROACTIVE DATE and prior to the expiration date of the POLICY PERIOD;
(3) the CLAIM results from the rendering of or failure to render PROFESSIONAL SERVICES;
(4) the CLAIM is deemed made during the POLICY PERIOD; and

---

characterizing Schulman's particular conduct as a "material misrepresentation" and discussing what Schulman "should have" done—do not set forth "facts" as contemplated under Local Rule 56.1(a).  *See Bordelon*, 233 F.3d at 527-28 (expressing Local Rule 56.1's concern with material facts, not legal argument).  The Court, therefore, denies MLM's request to strike Schulman's response corresponding to these paragraphs.

(5) the CLAIM is reported to US during the POLICY PERIOD or within 60 days after the end of the POLICY PERIOD.

A CLAIM is deemed made when:

(1) a demand is communicated to the INSURED for DAMAGES or PROFESSIONAL SERVICES;
(2) a lawsuit is served upon an INSURED seeking DAMAGES;
(3) the INSURED receives any notice or threat, whether written or oral, that a person, business entity or organization intends to hold an INSURED liable for DAMAGES; or
(4) an INSURED first becomes aware of any act, error or omission by any INSURED which could reasonably support or lead to a demand for DAMAGES.

ALL CLAIMS arising out of the same or related PROFESSIONAL SERVICES shall be considered one CLAIM, and shall be deemed made when the first CLAIM was deemed made.

(*Id.*).

The MLM Policies also contained a provision entitled "Notice of Claims and Disciplinary Actions," which provided:

In the event of a CLAIM, disciplinary action, disciplinary investigation or notice to appear before a review board, the INSURED must:

(1) give immediate written notice to US; and
(2) forward every demand, notice, summons or other communication received by the INSURED or his or her representative to [MLM]

You must give US notice during the POLICY PERIOD or within 60 days after the end of the POLICY PERIOD for coverage to apply.

(*Id.*).

The MLM Policies further defined "claims" as follows:

"CLAIM(S)" means:

(1) a demand communicated to the INSURED for DAMAGES or PROFESSIONAL SERVICES;
(2) a lawsuit served upon the INSURED seeking DAMAGES;
(3) any notice or threat, whether written or oral, that any person, business entity or organization intends to hold an INSURED liable for DAMAGES; or

(4) any act, error or omission by any INSURED which could reasonably support or lead to a demand for DAMAGES.

(*Id.*)

Finally, the MLM Policies contained a "Representation In Application" provision, which provided:

The application for coverage is a part of this policy. The application includes any Firm Information Verification form and/or Renewal Update form.

By acceptance of this policy the INSURED agrees:

(1) the statements in the application are the representations of all INSUREDS;
(2) such representations are material as this policy is issued in reliance upon the truth of such representations; and
(3) this policy embodies all of the agreements between the INSURED, US and/or OUR agent.

(*Id.*).

## B.    Schulman's Policy Application Process

For each of the years December 2002 through December 2011, Schulman signed and submitted Request-to-Issue Forms to MLM, certifying that he was "not aware of any claims or circumstances that could result in claims or disciplinary actions that have not been reported to" MLM.  (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 11).  In addition, beginning in December 2007, he submitted Warranty Pages to MLM, certifying that he was not aware of "any claims or circumstances that could result in claims or disciplinary actions that have not been reported to" MLM.  (*Id.*).

In December 2011, Schulman applied for the 2012 Policy.  In particular, he signed and submitted a "Firm Information Verification" form and several "Warranty Pages."  (*Id.* ¶¶ 12-13; R.1-2, 2012 Policy).  By signing the Firm Information Verification form, Schulman represented to MLM:  (i) that he was "not aware of any claims or circumstances that could reasonably result in claims or disciplinary actions that have not been reported to" MLM; (ii) that he understood

"that failure to report any known claims or potential claims, or other material information may result in the declination of coverage or policy rescission;" and (iii) that if his client "decides to abandon a patent application or allow a patent application to expire," such decision is "memorialized in writing[.]" (*Id.*). In the Warranty Page, Schulman further certified that he was not aware of any claims or circumstances that could result in claims or disciplinary actions that have not been reported to" MLM. (*Id.*). In addition, Schulman signed and submitted a Request-to-Issue form, again certifying that he was "not aware of any claims or circumstances that could result in claims or disciplinary actions that have not been reported to" MLM. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 14; R.178-5, Request-to-Issue Form for the 2012 Policy). MLM subsequently issued the 2012 Policy. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 14; R.178-2, Aliotti Aff. ¶ 20).

In December 2012 and December 2013, Schulman signed and submitted similar Warranty Pages and Request-to-Issue forms to apply for the 2013 Policy and the 2014 Policy, respectively. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 56-57, 63-64). Schulman further represented in applying for the 2014 Policy that if his client "decides to abandon a patent application or allow a patent application to expire," such decision is "memorialized in writing[.]" (R.124-4, 2014 Policy). In each of the corresponding renewal application forms, Schulman disclosed one incident "which could reasonably result in a claim being made" against him – incidents involving Kopta and ASICO, respectively. (R.210, Rule 56.1(b)(3)(B) Stmt. Facts ¶¶ 53, 55, 61-62; R.124-3, 2013 Policy; R.124-4, 2014 Policy).

At his deposition, Schulman testified that he did not read, or could not recall reading, the MLM Policies and the associated application forms. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 10; R.186-1, Schulman Dep. Tr. at 29-30, 285-88, 299-311, 364-65). Rather, he would answer "the

questions that [he] needed to answer to fill out the renewals" online, and would sign "whatever paper they sent [him] to sign to have the policy issue[.]" (*Id.* at 29, 300, 307). According to Schulman—until MLM initiated this declaratory judgment action—his "understanding of a claims made policy [was] that a claim will be covered in the period in which it is made and that a claim was an actual claim brought against you by another party." (*Id.* at 286, 307-09).

## IV.     The Kopta Action

### A.     Background

On July 12, 2005, Schulman filed a provisional patent application on behalf of Kopta. (R.186-1, Schulman Dep. Ex. 31 at ¶ 19). On July 11, 2006, he filed a non-provisional patent application on her behalf, claiming priority to the provisional application. (*Id.* ¶ 22). That same day, Schulman received an Electronic Acknowledgment Receipt from the United States Patent and Trademark Office ("PTO"), advising him that only the Declaration, Power of Attorney, and a Fee-Worksheet had been uploaded with the filing of the application. (*Id.* ¶¶ 26-27). On August 23, 2006, Schulman received a Notice of Incomplete Non-provisional Application from the PTO (the "Notice"), requesting that he upload drawings of the claimed invention, as required under 35 U.S.C. § 113, within two months of receipt of the Notice. (*Id.* ¶¶ 24, 29-31). The Notice further provided that the filing date would be the date of receipt of the required items. (*Id.* ¶ 30; R.186-1, Schulman Dep. Ex. 33).

On October 24, 2006, Schulman filed a petition in response to the Notice, requesting that the PTO accord the patent application a filing date of July 11, 2006. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 22). The PTO dismissed this petition in a letter dated August 6, 2008, explaining that, because the non-provisional application was incomplete when filed, the PTO could not grant the requested filing date. (*Id.*; R.186-1, Schulman Dep. Ex. 34 (the "Petition Dismissal")).

The letter also required Schulman to contact the PTO to indicate whether the applicant desired the later filing date of October 24, 2006 – that is, the date of the PTO's first receipt of at least one drawing. (*Id.*; R.186-1, Schulman Dep. Ex. 31 at ¶¶ 36-38). This date, however, was more than one year after the filing of the provisional patent application. (*Id.* at ¶ 37).

On October 29, 2008, the PTO issued—and Schulman received—a Notice of Abandonment in Kopta's patent application. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 23; R.186-1, Schulman Dep. Ex. 35 (the "Abandonment Notice")). Schulman did not report the Petition Dismissal or the Abandonment Notice to MLM at any time during 2008. (R.186-1, Schulman Dep. Tr. at 274-75). At no time did Kopta advise Schulman that she wished to abandon the patent application. (*Id.*; *see also* R.186-4, Kopta Request to Admit Response ¶ 9).

According to Schulman, after receiving the Abandonment Notice, he orally informed Kopta "on more than one occasion that the application was dead and could not be revived." (R.186-1, Schulman Dep. Ex. 31 at ¶ 45; *see also* R.186-1, Schulman Dep. Tr. at 278 ("I had told her about this in 2008")). Kopta disagrees, alleging—in a 2013 malpractice action against Schulman (the "Kopta Action")—that "Schulman finally informed [her] about the patent application issues for the first time in November 2011 . . . up to this point, every time that [she] inquired into the status of [the] patent application, Schulman affirmatively orally represented to [her] that the application was proceeding normally and without issue." (R.124-5, Kopta Compl. ¶ 33). At his deposition, Schulman testified to receiving a series of e-mails from Kopta in March and June 2011, in which she asked for news about her application. (R.186-1, Schulman Dep. Tr. at 275-76). Schulman "thought that possibly someone had coached her into sending those e-mails and wording them the way that she did . . . To make it appear that I hadn't communicated with her at all about the applications." (*Id.* at 276-77). He wondered, however, why somebody

had coached her into sending these e-mails when it had been "more than two years since I told her the case went abandoned." (*Id.* at 278-79).

In November 2011, Schulman sent Kopta a draft response to the Petition Dismissal. (R.186-1, Schulman Dep. Ex. 31 at ¶ 54). According to Kopta, this was the first time she heard about issues surrounding her patent application. (R.124-5, Kopta Compl. ¶ 32). On December 5, 2011, Schulman filed a Petition for Revival of an Application for Patent Abandoned Unintentionally, as well as a response to the Petition Dismissal, requesting that the PTO restore the application to active status and put it in line for examination. (R.186-1, Schulman Dep. Ex. 31 at ¶ 55 (the "Revival Petition")). As of December 5, 2011, however, Schulman was "still of the opinion that the application was dead and could not be revived," deeming it "extremely unlikely" that the PTO would grant Kopta "a filing date for her application that was within one year of her initial provisional application." (R.186-1, Schulman Dep. Tr. at 279-81). He nonetheless filed the Revival Petition, viewing it as "a way, first of all, to make a plea to the [PTO] that the case should be reinstated; and, second of all, that if the [PTO] said no, then [Kopta] would have something in hand that said there is nothing more than that they're going to do." (*Id.* at 280). The PTO dismissed the Revival Petition on March 12, 2012. (*Id.* at 281-82; R.186-1, Schulman Dep. Ex. 31 at ¶¶ 57-60). On October 25, 2013, Kopta commenced the Kopta Action. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 27).

**B.      Disclosures to MLM**

When applying on December 27, 2011 for the 2012 Policy, Schulman did not disclose the 2008 Petition Dismissal, the 2008 Notice of Abandonment, or the 2011 Revival Petition with respect to Kopta. (R.1-2, 2012 Policy; R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 12).

On March 28, 2012, Schulman left a voicemail at MLM's offices, stating that he needed to report a claim. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 49). This was the first time that Schulman had ever reported, or attempted to report, any claim or incident to MLM. (*Id.*). On March 29, Schulman spoke with an MLM claim supervisor and reported a claim involving an unnamed client and the PTO's refusal to accept drawings as part of a utility patent application. (*Id.*). Schulman did not send MLM any written claim information, however, and—by letter dated June 12, 2012—MLM denied coverage for the matter that he had reported. (*Id.* ¶¶ 50-51). In particular, MLM observed that the facts—as relayed by Schulman on March 29—indicated that he "had knowledge of this claim, prior to the submission of the Firm Information Verification form and prior to the January 1, 2012 effective date" of the 2012 Policy. (R.185-1, June 2012 Letter from MLM to Schulman).[6] MLM's in-house claims counsel, who authored the letter, "heard nothing further from or about Schulman until January 2014." (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 52).

When applying on December 26, 2012 for the 2013 Policy, Schulman disclosed only one incident—the Kopta incident—as follows:

> I have checked the "aware of claim" box for an incident that took place in 2006. At that time I was not aware that I had to report it. I filed a patent application on-line for the first time. The Patent Office later informed us that the application drawings had not been included (although to my recollection each of the screens I reviewed during the application process showed the drawings were included). Submitting the drawings and getting a later filing date was not possible because the client had made the invention public more than one year prior. I petitioned to have the drawings accepted under a rule that allowed the drawings from a case from which priority was claimed to be accepted. The petition was denied because the priority information was in the second paragraph of the application rather than the first. I informed the client of the outcome. I has [*sic*]

---

[6] Specifically, the letter noted: "However, in 2006, you filed a patent application online to the USPO, which stalled due to a lack of drawings included with the application. You later submitted drawings from a provisional patent. The patent application was then denied because no mention of the provisional patent was included in the first paragraph of the application, and was mentioned in the second paragraph only. In late 2011 or early 2012, your client decided that she wanted you to pursue the patent denial further, and you filed a petition to revive the application, which you later learned was filed too late, as the expiration for the petition for reconsideration was two months after the original application denial in 2006." (*Id.*).

sporadic contact with the client after that – this year the client asked me to see if anything else could be done. I filed a petition to revive the application to argue that the rule concerning the placement of the priority information should be waived. The petition was refused because the application had never been assigned a serial number. I am not sure how to handle this on the renewal application.

(R.124-3, 2013 Policy; R.210, Rule 56.1(b)(3)(B) Stmt. Facts ¶ 53). After confirming with Schulman that this was the same incident for which MLM had denied coverage under the 2012 Policy, MLM issued the 2013 Policy. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 54-57; R.184-5, Dec. 27, 2012 E-mail from MLM to Schulman).

On February 6, 2014, Schulman contacted MLM's in-house claims counsel and informed her of the Kopta Action. He sent a copy of the complaint four days later. MLM undertook the defense of the Kopta Action under a full reservation of rights. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 68-70).

## V. The ASICO Matters

### A. Background

By July 2011, ASICO was a "major client" of Schulman, with over 200 active matters. (R.186-1, Schulman Dep. Tr. at 46). Given this, Schulman created a separate docket for ASICO matters, which he prepared himself by changing various entries as "things came in from the patent office," "so that, in theory, . . . each month when the new docket was printed out, it included all the matters that had come in from the patent office[.]" (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 17). Schulman sent the docket sheets to ASICO, in part, to advise them on the status of their matters, "including whether the matters had been abandoned." (R.186-2, Schulman Request to Admit Response ¶ 13). As a general practice, however, he did not double-check the accuracy of the docket sheets before sending them to ASICO, including with respect to abandonment status. (*Id.* ¶¶ 18, 20). Nor did Schulman memorialize, in writing, ASICO's

decision to abandon a patent application. (*Id.* ¶ 19; R.186-1, Schulman Dep. Tr. at 60 ("I didn't make a practice of writing to them and saying you've instructed me to abandon case such-and-such")). Some ASICO matters "went abandoned because [he] didn't notice they went abandoned," which "happened more than just a few times." (R.186-1, Schulman Dep. Tr. at 61-62). Schulman would then "investigate as to why it went abandoned, and . . . file a petition to revive it." (*Id.*).

The record reflects the following with respect to ASICO Case Nos. 137, 176, 179, 180, 194, and 203:

1. **Case No. 137**: The PTO mailed Schulman a Notice of Abandonment, dated December 2, 2008, with respect to a patent application corresponding to Case No. 137. (R.186-2, Schulman Request to Admit Response ¶¶ 42, 47). The docket sheets Schulman sent to ASICO in 2011, 2012, and December 2013 did not show the abandonment of Case No. 137. (*Id.* ¶¶ 47-48). ASICO did not advise Schulman that it wished to abandon Case No. 137. (*Id.* ¶ 49). Schulman took no action with the PTO with respect to Case No. 137 after the December 2, 2008 abandonment notice. (*Id.* ¶¶ 45-46). (*See also* R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 34-36).

2. **Case No. 179**: The PTO mailed Schulman a Notice of Abandonment, dated May 11, 2010, with respect to a patent application corresponding to Case No. 179. (R.186-2, Schulman Request to Admit Response ¶¶ 24, 26). The docket sheets Schulman sent to ASICO in 2011, 2012, and December 2013 did not show the abandonment of Case No. 179. (*Id.* ¶¶ 27-28). ASICO did not advise Schulman that it wished to abandon Case No. 179. (*Id.* ¶ 29). Schulman took no action with the PTO with respect to Case No. 179 after the May 11, 2010 abandonment notice. (*Id.* ¶ 25). (*See also* R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 28-30).

3. **Case No. 176**: The PTO mailed Schulman a Notice of Abandonment, dated August 4, 2010, with respect to a patent application corresponding to Case No. 176. (R.186-2, Schulman Request to Admit Response ¶¶ 15, 19). The docket sheets Schulman sent to ASICO in 2011, 2012, and December 2013 did not show the abandonment of Case No. 176. (*Id.* ¶¶ 20-21). ASICO did not advise Schulman that it wished to abandon Case No. 176. (*Id.* ¶ 22). Schulman took no action with the PTO with respect to Case No. 176 after the August 4, 2010 abandonment notice. (*Id.* ¶¶ 17-18). (*See also* R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 31-33).

4. **Case No. 180**: The PTO mailed Schulman a Notice of Abandonment, dated March 1, 2011, with respect to a patent application corresponding to Case No. 180. (R.186-2, Schulman Request to Admit Response ¶¶ 32, 36). The docket sheets Schulman sent

to ASICO in 2011, 2012, and December 2013 did not show the abandonment of Case No. 180. (*Id.* ¶¶ 37-38). ASICO did not advise Schulman that it wished to abandon Case No. 180. (*Id.* ¶ 39). Schulman took no action with the PTO with respect to Case No. 180 after the March 1, 2011 abandonment notice. (*Id.* ¶¶ 34-35). (*See also* R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 37-38).

5. **Case No. 203**: The PTO mailed Schulman a Notice of Abandonment, dated January 19, 2012, with respect to a patent application corresponding to Case No. 203. (R.186-2, Schulman Request to Admit Response ¶¶ 52, 56). The docket sheets Schulman sent to ASICO in 2012 and December 2013 did not show the abandonment of Case No. 203. (*Id.* ¶¶ 57-58). ASICO did not advise Schulman that it wished to abandon Case No. 203. (*Id.* ¶ 59). Schulman took no action with the PTO with respect to Case No. 203 after the January 19, 2012 abandonment notice. (*Id.* ¶¶ 54-55). (*See also* R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 59).

6. **Case No. 194**: In 2010, Schulman discovered his "oversight" in failing to file a utility application based on a provisional application—corresponding to Case No. 194—that "had a one-year lifespan." (R.186-1, Schulman Dep. Tr. at 89-95; R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 39-40).

7. **Case No. 164**: On December 2, 2013, Schulman e-mailed ASICO regarding a docketing "mistake" for a patent application corresponding to Case No. 164, for which no "corrective action [was] available." (R.186-1, Schulman Dep. Tr. at 215-20; R.186-1, Schulman Dep. Ex. 22 (ASICO to Schulman: "Are we to assume that there is no corrective action that can be done, due to your error?")).

8. **Other ASICO Cases**: Schulman did not advise ASICO of the abandonment of 21 matters identified in a July 10, 2014 letter sent to the Illinois Attorney Registration and Disciplinary Commission ("ARDC") by ASICO's new patent counsel. (R.186-2, Schulman Request to Admit Response ¶ 65; R.99-2, July 10, 2014 Letter). ASICO never advised Schulman that it wished to abandon these matters. (*Id.* ¶ 68). Case Nos. 179, 137, 180, and 203 were among the 21 matters so identified. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 30, 36, 38, 59).

### B. Disclosures to MLM

When applying for the 2012 Policy, Schulman did not disclose the 2008, 2010, or 2011 Notices of Abandonment mailed to him regarding Case Nos. 137, 176, 179, or 180. (R.186-2, Schulman Request to Admit Response ¶¶ 72-76). He further did not disclose any facts or circumstances concerning his 2010 discovery of a filing "oversight" related to Case No. 194. (*Id.* ¶¶ 70-71). When applying for the 2013 Policy, Schulman failed to disclose these items in

addition to the 2012 Notice of Abandonment mailed to him regarding Case No. 203. (*Id.* ¶ 76; *see also* R.1-2, 2012 Policy; R.124-3, 2013 Policy). In addition, when applying for the 2014 Policy, Schulman failed to disclose his December 2, 2013 admission to ASICO of a docketing error with respect to Case No. 164. (R.186-1, Schulman Dep. Tr. at 348).

Schulman did report Case No. 194 to MLM in December 2013, when applying for the 2014 Policy. (R.186-2, Schulman Request to Admit Response ¶¶ 70-71). This was the first incident involving ASICO that Schulman had ever reported to MLM, as well as the only incident that he reported during 2013. (*Id.*; R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 61). In particular, he disclosed an incident involving "ASICO LLC"—later determined to be Case No. 194—as follows:

> A provisional application for an invention was filed on September 28, 2007. No utility application was subsequently filed. In 2010 we learned that Company A had filed an application in which the client's opinion was the same. The client also informed me that the client and inventor had disclosed the invention to Company A and Company A had refused it. It was decided to file a utility application and seek an interference in the Patent Office to determine inventorship. The utility application was filed on August 10, 2010 and is now in progress. At a meeting in September, 2013 the case was discussed and the client later asked me for a memo with a proposed strategy and response. I supplied the requested information but the client has not yet acted on my requests to file the papers with the Patent Office.
>
> The inventor had a written agreement with Company A at the time the invention was made and the agreement obligated the inventor to disclose inventions to Company A. Client has told me that Company A refused the invention in writing but has never provided a copy to me despite several requests.

(R.124-4, 2014 Policy; R.210, Rule 56.1(b)(3)(B) Stmt. Facts ¶ 62).

## VI.     The Declaratory Judgment Action

Throughout January – April, 2014, MLM requested information from Schulman regarding the "ASICO LLC" matter referenced in his renewal application for the 2014 Policy. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 67-70). On April 17, 2014, MLM's coverage counsel sent

Schulman a letter (i) confirming MLM's reservation of rights with respect to the Kopta Action and asserting coverage defenses; and (ii) renewing MLM's request for information regarding the "ASICO LLC" matter. (R.178-11, Sherren Aff. ¶ 15; R.178-14, Apr. 17, 2014 Letter). Schulman did not respond to the letter or otherwise provide the requested information. (R.178-11, Sherren Aff. ¶ 17). On June 26, 2014, MLM instituted this action. (R.1).

Neither MLM nor its coverage counsel received any further information about the "ASICO LLC" matter until December 31, 2014. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶ 72). On that day, Schulman sent MLM an e-mail attaching two, redacted notices of proceedings filed on behalf of ASICO – one with the Office of Enforcement and Discipline of the PTO ("OED"), and the other with the ARDC. (R.185-5, Dec. 31, 2014 E-mail between Schulman and MLM). MLM requested further information and agreed to indemnify Schulman in the ARDC and OED proceedings under a full reservation of rights, subsequently amending its pleadings in this action to seek rescission and/or declarations of non-coverage for ASICO claims under the MLM Policies. (R.178, Rule 56.1(a)(3) Stmt. Facts ¶¶ 73-75). Schulman continues to practice patent and trademark law without professional liability insurance. (*Id.* ¶ 79).[7]

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "The mere existence of *some* alleged factual dispute will not defeat summary judgment." *Bordelon v. Bd. of Educ. of the City of*

---

[7] After MLM declined to renew his policy for 2015, Schulman purchased an Extended Reporting Endorsement ("ERE") under the terms of the 2014 Policy. (*Id.* at ¶ 78).

*Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) (quoting *Anderson*, 477 U.S. at 247-48).  In

determining summary judgment motions, "facts must be viewed in the light most favorable to the

nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S.

372, 380 (2007).  The party seeking summary judgment has the burden of establishing that there

is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  After "a properly supported motion for summary judgment is made, the adverse party

must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S.

at 255 (quotation omitted); *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th

Cir. 2015).

## ANALYSIS

I.      **Count I (Policy Rescission)**

MLM seeks rescission of the 2012 Policy, the 2013 Policy, and the 2014 Policy under

Section 154 of the Illinois Insurance Code.[8]  Section 154 provides, in part, that:

> No misrepresentation or false warranty made by the insured or in his behalf in the
> negotiation for a policy of insurance, or breach of a condition of such policy shall defeat
> or avoid the policy or prevent its attaching unless such misrepresentation, false warranty
> or condition shall have been stated in the policy or endorsement or rider attached thereto,
> or in the written application therefor.  No such misrepresentation or false warranty shall
> defeat or avoid the policy unless it shall have been made with actual intent to deceive or
> materially affects either the acceptance of the risk or the hazard assumed by the company.

215 ILCS 5/154;[9] *see also Illinois State Bar Ass'n Mut. Ins. Co. v. Law Office of Tuzzolino &*

*Terpinas*, 389 Ill. Dec. 575, 27 N.E.3d 67, 71 (2015) ("First, the statement must be false, and

second, it either must have been made with an actual intent to deceive or must 'materially affect

the acceptance of the risk or hazard assumed by the insurer'").  "The statute's provisions are to

---

[8]  MLM does not seek rescission of the claims-made policies it issued to Schulman in 2003-2011, insofar as it is
undisputed that Schulman did not report any claim to MLM until March 2012.

[9]  Schulman does not dispute (i) the application of Illinois law, or (ii) the timeliness of MLM's rescission claims
under Section 154.

be read in the disjunctive, so that either an actual intent to deceive *or* a material misrepresentation which affects either the acceptance of the risk or the hazard to be assumed can defeat or avoid the policy." *Id.* (citation omitted). "In other words, it is unnecessary for the insurer to prove that a misrepresentation was made with the intent to deceive if it was material to the risk assumed." *Id.* (citation omitted).

### A. Misrepresentation

The Court first addresses whether Schulman made a misrepresentation in his policy applications. *See Methodist Med. Ctr. of Illinois v. Am. Med. Sec. Inc.*, 38 F.3d 316, 319 (7th Cir. 1994) ("Before a court may determine if a misrepresentation was made with actual intent to deceive or was material, the court must find that a misrepresentation was made"). "A misrepresentation in an application for insurance is a statement of something as a fact which is untrue and affects the risk undertaken by the insurer." *Virginia Sur. Co. v. Bill's Builders, Inc.*, 372 Ill. App. 3d 595, 604, 865 N.E.2d 985, 992 (3d Dist. 2007) (citing *Ratcliffe v. Int'l Surplus Lines Ins. Co.*, 194 Ill. App. 3d 18, 25, 550 N.E.2d 1052, 1057 (1st Dist. 1990)). A policy applicant's failure to disclose known facts which might give rise to a claim may constitute a misrepresentation. *See Ratcliffe*, 550 N.E.2d at 1057-58; *see also Methodist*, 38 F.3d at 320 ("Incomplete answers or a failure to disclose material information on an application for insurance may constitute a misrepresentation when the omission prevents the insurer from adequately assessing the risk involved").

MLM argues that Schulman's applications for the MLM Policies contained a number of misrepresentations. In particular, with respect to the 2012 Policy, MLM points to undisputed evidence reflecting: (1) Schulman's affirmative representation that he memorialized in writing a client's decision to abandon a patent application, when, in practice, he did not; (2) his failure to

disclose the 2008 Petition Dismissal or the 2008 Notice of Abandonment with respect to Kopta's incomplete patent application; (3) his failure to disclose his receipt of e-mails from Kopta in 2011 asking for news of her application, including his belief that she had been "coached" to send those e-mails, and his subsequent filing of the Revival Petition despite his belief that its success was "extremely unlikely;" (4) his failure to disclose a known filing error with respect to ASICO Case No. 194; and (5) his failure to disclose abandonment notices mailed to him with respect to ASICO Case Nos. 137, 176, 179, or 180,[10] some of which—in light of ASICO's undisputed lack of knowledge or consent to the abandonment—later formed the basis of the ARDC investigation. With respect to the 2013 Policy, MLM points to:  (1) Schulman's continued and undisputed failure to disclose the abandonment notices mailed to him with respect to ASICO Case Nos. 137, 176, 179, or 180, along with the known oversight concerning Case No. 194; and (2) his failure to disclose the abandonment notice mailed to him with respect to Case No. 203 – another matter about which he undisputedly failed to advise ASICO, resulting in the subsequent ARDC investigation.  With respect to the 2014 Policy, MLM further points to undisputed evidence reflecting:  (1) Schulman's failure to disclose a known error for which no "corrective action [was] available" on ASICO Case No. 164; and (2) his continued misrepresentation regarding the written memorialization of his clients' abandonment decisions.

Even viewed in the light most favorable to Schulman, the record supports a finding of misrepresentation with respect to each policy in dispute.  Schulman's affirmative certification that he had no knowledge of any circumstances that could result in claims—coupled with his

---

[10]  Schulman's failure to recall the exact date on which he received these abandonment notices, moreover, does not create a triable issue of fact regarding delivery.  *See Vincent v. City Colleges of Chicago*, 485 F.3d 919, 922 (7th Cir. 2007) ("Evidence of mailing is evidence of delivery").  (*See also* R.219-1 (Stipulated Facts and Joint Legal Conclusions between the PTO and Schulman, dated April 13, 2016) (stipulating, among other facts, that Schulman "did not inform [clients] of important [PTO] correspondence regarding the applications" and "failed to timely respond to [PTO] communications")).

undisputed and repeated omissions concerning abandonment notices, petition dismissals, and docketing errors, even after his clients sent follow-up inquiries—prevented an adequate assessment of insurance risk. *See Methodist*, 38 F.3d at 320. With respect to the 2012 Policy and the 2014 Policy, moreover, a reasonable applicant would have understood that, by asking about the written memorialization of abandonment decisions, MLM wanted to know whether Schulman, in fact, documented such decisions. His non-truthful response meant that MLM "was not able to correctly price the insurance policy based on the risk it was undertaking." *See Essex Ins. Co. v. Galilee Med. Ctr. S.C.*, 815 F.3d 319, 323 (7th Cir. 2016).

Schulman's chief counterargument—that he did not believe that any "claim" existed with respect to Kopta or ASICO—does not convince the Court to hold otherwise. "Whether a misrepresentation occurred is determined objectively, on the basis of the facts known to the insured at the time of application, regardless of the insured's subjective belief as to the truth of the representations." *See W. World Ins. Co. v. Majercak*, 490 F. Supp. 2d 937, 941 (N.D. Ill. 2007) (citing *Ratcliffe*, 550 N.E.2d at 1057-58). Here, the application materials for the MLM Policies asked whether Schulman was aware of (i) "any claims or circumstances that *could reasonably result* in claims or disciplinary actions[,]" or (ii) "any claims or circumstances that *could result* in claims or disciplinary actions[.]" (R.1-2, 2012 Policy; R.124-3, 2013 Policy; R.124-4, 2014 Policy) (emphasis added). Neither clause calls for the wholly subjective evaluation of known facts by the insured. Rather, the language requires the disclosure of "any" facts that "could result" in claims or disciplinary actions. *See Ratcliffe*, 550 N.E.2d at 1057-58; *see also Minnesota Lawyers Mut. Ins. Co. v. Larson*, No. 06-CV-074-WDS, 2007 WL 2688443, at *9 (S.D. Ill. Sept. 11, 2007) (claims-made policies required actual knowledge of "facts which could support [a] claim against [insured] for malpractice liability" but did not "require there to

have been an actual claim filed" against insured); *accord Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, 712 F.3d 336, 343 (7th Cir. 2013).  Schulman's subjective beliefs, therefore, concerning (i) the time-barred nature of any malpractice claim arising from Kopta's patent application or from ASICO Case 194, or (ii) the "understanding" he reached with ASICO that, "if a case went abandoned," he would attempt to revive it at his own expense, (R.186-1, Schulman Dep. Tr. at 63-64, 220, 278-79), do not impact the Court's analysis.  Even construing these beliefs as objective facts—a construction that the Court is not obligated to afford, given Schulman's Local Rule 56.1 violations—the summary record supports MLM.  In other words, even viewing the evidence in the light most favorable to Schulman, the totality of circumstances in December 2011, December 2012, and December 2013 "could" have led to the demands and disciplinary actions that ultimately ensued.  Schulman's arguments to the contrary ignore that an applicant "cannot pick and choose what to tell his insurer, or take it upon itself to determine whether the information it holds regarding a change in circumstances or conditions that may lead to a future claim are material."  *St. Paul Reinsurance Co. v. Williams & Montgomery, Ltd.*, No. 00 C 5037, 2001 WL 1242891, at *6 (N.D. Ill. Oct. 17, 2001).

Relatedly, Schulman's undisputed failure to read the MLM Policies, and to understand the meaning of the term "claim," does not excuse his misstatements and omissions in completing the application forms.  Illinois law charges an insured with "knowing the particulars of the policy."  *See Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 903-05 (7th Cir. 2011); *Am. Auto. Ins. Co. v. B.D. McClure & Associates, Ltd.*, No. 09 C 1589, 2011 WL 211204, at *4 (N.D. Ill. Jan. 21, 2011) ("regardless of whether the insured received the policy, an insured is typically charged with notice of the contents of the insurance policy, especially if the policy was available and the insured was not prevented from reading it") (citations and

quotations omitted).  Here, the MLM Policies clearly defined "claim" to include not only a "demand communicated to the [insured] for [damages,]" but also "any act, error or omission by any [insured] which could reasonably support or lead to a demand for [damages]."  (R.1-2, 2012 Policy; R.124-3, 2013 Policy; R.124-4, 2014 Policy).  Given Schulman's undisputed failure to review the policy language, his belief that a "claim" meant a legal demand does not raise a triable issue of fact precluding summary judgment in favor of MLM.

Schulman's final argument—that his application answers "were not made to mislead MLM" (R.208, Response Br. at 3)—likewise does not preclude a finding of misrepresentation.  Under Illinois law, "a misrepresentation, even if innocently made, can serve as the basis to void a policy."  *Essex*, 815 F.3d at 323; *Ratcliffe*, 550 N.E.2d at 1057 ("A material misrepresentation will avoid the contract even though made through mistake or good faith").  "In other words, it is unnecessary for the insurer to prove that a misrepresentation was made with the intent to deceive if it was material to the risk assumed."  *Illinois State Bar*, 27 N.E.3d at 71.  Because MLM relies on the "materiality" prong, the Court need not evaluate Schulman's intent.  Accordingly, having found that Schulman made various misrepresentations in applying for the MLM Policies, the Court turns to the materiality analysis.

### B.    Materiality

To evaluate materiality under Illinois law, courts employ "an objective test that asks whether a 'reasonably careful and intelligent' underwriter 'would regard the facts as stated to substantially increase the chances of the event insured against, so as to cause a rejection of the application."  *Essex*, 815 F.3d at 324 (citing *Small v. Prudential Life Ins. Co.*, 246 Ill. App. 3d 893, 896-97, 617 N.E.2d 80, 83 (1st Dist. 1993)).  Testimony from the insurer's underwriter may be used to establish materiality.  *Id.*

Here, MLM submits an affidavit from its underwriter, averring that MLM would have declined to renew the policies or, "at a minimum, would have required substantially more premium for the greatly increased risk," had Schulman responded truthfully on his applications. (R.178-2, Aliotti Aff. ¶¶ 23, 36, 47). That conclusion is consistent with the policies themselves, each of which informed Schulman that his application statements "are material as this policy is issued in reliance upon the truth of such representations." (R.1-2, 2012 Policy; R.124-3, 2013 Policy; R.124-4, 2014 Policy). *See also Essex*, 815 F.3d at 324 (analyzing a similar "representation in application" provision and deeming omissions "sufficiently material to warrant rescission"). While "the materiality of a misrepresentation is ordinarily a question of fact, summary judgment is appropriate where the misrepresentation is of such a nature that no one would dispute its materiality." *Methodist*, 38 F.3d at 320. Here, Schulman introduces no evidence or argument to counter the reasonable inference of materiality. Indeed, his conduct led to MLM's exposure in the Kopta Action and in the ARDC and OED proceedings involving ASICO and other clients. Thus, "it borders on the surreal to think that the nondisclosure was immaterial." *Essex*, 815 F.3d at 324. Even viewing the facts in the light most favorable to Schulman, the Court finds that he made material misrepresentations in his application for the 2012 Policy, the 2013 Policy, and the 2014 Policy. Accordingly, the Court grants MLM its requested rescission relief under Section 154.

## II.    Counts III and V

Having found that MLM is entitled to rescind the MLM Policies, including the ERE issued under the 2014 Policy, the Court grants summary judgment in favor of MLM on Count I of the Second Amended Complaint. The Court declares that the MLM Policies provide no coverage—and MLM owes no associated defense or indemnity obligation—to Schulman with

respect to any claims, suits, or disciplinary investigations or actions thereunder. *See Illinois State Bar*, 27 N.E.3d at 74-75 ("the issue is the effect of that misrepresentation on the validity of the policy as a whole"); *TIG Ins. Co. v. Reliable Research Co.*, 228 F. Supp. 2d 921, 927 (S.D. Ill. 2002), *aff'd sub nom.* 334 F.3d 630 (7th Cir. 2003) ("The misrepresentation on the application through which the insurer seeks rescission need not be related to the claim for which the insured eventually seeks coverage"). Given this disposition, the Court denies as moot MLM's motion for summary judgment as to Counts III and V, both of which seek the same relief as Count I – specifically, a declaration of non-coverage under the MLM Policies.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for summary judgment as to Count I of the Second Amended Complaint and declares the policies in dispute to be rescinded. (R.176). The Court denies as moot Plaintiff's motion as to Counts III and V and preserves the status hearing set for October 11, 2016.


**Dated:** September 19, 2016                    ENTERED

                                                AMY J. ST. EVE
                                                United States District Court Judge